**AFFIRMED and Opinion Filed December 20, 2018**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-17-00938-CV**

## IN RE COMMITMENT OF MARCUS ELOISE ROLLINGS

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CV-16-70006**

## MEMORANDUM OPINION
Before Justices Francis, Stoddart, and Schenck
Opinion by Justice Francis

After a jury found Marcus Eloise Rollings is a sexually violent predator as defined by Chapter 841 of the Texas Health and Safety Code, the trial court ordered him civilly committed for treatment and supervision upon his release from prison. In two issues on appeal, Rollings contends the evidence is legally insufficient to support his commitment and the trial court erred in limiting his voir dire. We affirm the trial court's judgment.

In 1999, the Texas Legislature enacted the Civil Commitment of Sexually Violent Predators Act to protect society from "a small but extremely dangerous group of sexually violent predators" who "have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.001. The Act provides for the involuntary civil commitment, by means of outpatient treatment and supervision, of a repeat sexual offender who is found to be a sexually violent predator. *Id*. §§ 841.003(a), 841.081(a).

To warrant a person's commitment as an SVP, the State is required to prove beyond a reasonable doubt that the person is (1) "a repeat sexually violent offender" and (2) "suffers from a behavior abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id*. § 841.003(a). A person is a repeat sexually violent offender if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id*. § 841.003(b). A "behavioral abnormality" is a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity," predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2). Until recently, all cases were required to be brought in Montgomery County, but in 2015 the Legislature amended the Act to require the petition to be filed "in the court of conviction for the person's most recent sexually violent offense." *Id*. § 841.041(a).

Rollings was incarcerated in the state prison system on two convictions for sex-related offenses against children. In August 2016, nine months before his scheduled release from prison, the State filed a petition in Dallas County alleging Rollings is a sexually violent predator as defined by section 841.003 and sought to have him committed for treatment and supervision. The case went to trial in March 2017. The State and defense presented competing evidence on whether Rollings suffers from a behavioral abnormality.

The evidence showed that, in 2003, Rollings pleaded guilty to indecency with a child in connection with a 2002 sexual assault on seven-year-old S.B., who Rollings believed at the time was his biological daughter. Evidence showed Rollings went into S.B.'s bedroom, got into bed with her, and put his penis "somewhere on her buttocks." The child's mother walked in at some point and notified the police. S.B. told the police Rollings had molested her before, but she and her mother did not report it. Rollings gave a statement to the police admitting the offense. In his handwritten statement, Rollings said he had been masturbating when S.B. came into his room, got

into bed with him, and he put his penis "between her butt on top of her shorts." He said it happened only once. Rollings was sentenced to fifteen years in prison.

While in prison, a second child, A.L., made an outcry about an earlier incident. A.L. is the son of Rollings's former fiancée. A.L. reported that in 2000, when he was twelve or thirteen years old, Rollings came into his room, laid on his bed, began kissing him on the neck, and got an erection. When A.L. tried to push him away, Rollings threatened to tell A.L.'s mother that A.L. "tried to have sex with him." Rollings then stuck his middle finger in A.L.'s anus, and A.L. began to cry. Rollings then penetrated A.L.'s anus with his penis until he ejaculated. Rollings left the room when he heard a noise causing him to believe someone else was in the house. Rollings pleaded guilty to aggravated sexual assault of a child under fourteen and was sentenced to twelve years in prison.

The State's expert, Dr. Randall Price, a board-certified forensic psychologist and licensed sex offender treatment provider, testified he conducted a two-and-a-half-hour interview of Rollings and reviewed his deposition, police reports, victim statements, school files, employment records, prison disciplinary records, medical files, prison sex offender treatment program notes, and other psychological evaluations of Rollings. Some of these records, he said, dated back to Rollings's adolescence. In addition, he completed tests that measured the risk of sexual reoffending. Based on his evaluation, he formed the opinion that Rollings suffered a behavior abnormality that makes him likely to engage in a predatory act of sexual violence. He explained that, in his opinion, "likely" means "more than a mere possibility" and this was the definition he relied upon in his evaluation.

Price considered a number of risk factors in forming his opinion. Prior to his convictions for sexual offenses against children, Rollings had a lengthy criminal history for non-sexual offenses, beginning at age fifteen, including burglary of a habitation, auto theft, possession of

cocaine, burglary of a motor vehicle, three convictions for unauthorized use of a motor vehicle, and possession of a controlled substance with intent to deliver. Rollings was on probation or parole when he committed many of these offenses. When Price discussed these offenses with Rollings, he denied them or did not accept responsibility for them. According to Price, Rollings always had "an explanation that it was a mistake" or it was "somebody else's fault."

Similarly, when Price asked Rollings about the sex-related offenses, Rollings denied that he committed either even though he pleaded guilty to both. Price believed that was significant. With respect to S.B., Price said Rollings blamed the child's mother and said the child's mother later admitted it "was a lie." With respect to the offense involving A.L., Price found it significant Rollings continued to be aroused despite the fact A.L. was crying during the attack, which was evidence the child was in psychological or physical pain. Price also described Rollings' threat to A.L. as psychological coercion. Other risk factors were the "sexually violent" aspect of the crime and the fact the victim was a male.

Price identified sexual deviance and antisocial behavior as the two biggest risk factors in reoffending. Price diagnosed Rollings as a pedophile and characterized his sexual offenses as sexually deviant because they were against children. Sexual deviance, he said, is abnormal sexual interest, arousal patterns, or sexual behavior. He also said the fact that Rollings had both male and female victims increased the risk of offending because it increased the pool of potential victims. Similarly, the fact the victims were of different age groups increased that pool.

Price said Rollings' overall criminal history was important to his evaluation because, as he said, the "antisocial aspect" is "one pathway to committing sexual offenses." Price diagnosed Rollings with a "trace of features" of antisocial personality disorder. Price explained that Rollings's criminal history demonstrates his "capacity to do things against the law and to not feel bad about that." In keeping with this, Price also found it significant that Rollings continued to

–4–

commit crimes while on probation or parole. As he explained, part of the reason for parole or probation is to give a person a chance to change his behavior under supervised conditions. When the person reoffends after being sanctioned and punished, it relates to his "volitional capacity" or ability to control his behavior.

Price also diagnosed Rollings with substance abuse problems, which is another risk factor. Rollings told Price he began using alcohol at age fourteen and by the time he was seventeen to nineteen, he was using crack cocaine daily. Rollings stopped using alcohol and drugs when he went to prison and also reported that he stopped on his own for a period of time between prison stints.

Price completed two testing assessments of Rollings. The first was the Hare Psychotherapy Checklist, Revised (PCLR), an instrument that assesses the level of psychopathic traits. Price said psychopathy is a personality disorder, like antisocial personality disorder, but is more serious because it involves aspects of repeated criminal conduct, taking advantage of others, or failing to take responsibility to society in some way. Price explained that a psychopath manipulates others for his own good, and psychopathy is a risk factor for sex offenders. The PCLR contains twenty traits of a psychopath and has a detailed scoring system. Among the traits that Rollings scored highest were "conning/manipulative," "lack of remorse," "shallow affect," and "callous/lack of empathy." Price said Rollings had moderate to high psychopathic traits, but his overall score did not meet the level of a "prototypical psychopath."

The second test used by Price was the Static-99R, an actuarial instrument that establishes a "baseline" for the risk of reoffending sexually. This instrument looks at ten static risk factors of a person's past, including prior sexual and non-sexual offenses and convictions, the age of the offender upon release, whether the offender has ever "lived with a lover" for at least two years, whether the sex offense victims were strangers to the offender, and whether the victims were male.

Once Price determines a score, he looks at an "actuarial table" that tells him how many other sex offenders with the same score reoffended within five years.

According to Price, Rollings scored "3," which put him at an "average" risk to reoffend. In arriving at that score, Price noted the presence of the following risk factors: (1) Rollings had never lived with a lover for at least two years; (2) he had four or more prior sentencing dates; (3) his victims were not related to him; and (4) he had a male victim. These risks were offset by Rollings's age on release, 47, because Price said the older a person gets, the less likely he is to engage in criminal conduct, especially violent or sexual conduct. In addition, Rollings scored zero points for "prior sex offenses," although he had two. Price explained that because Rollings had not been charged with or convicted of sexually assaulting A.L. when he was convicted of molesting S.B., the first offense did not count as a "prior sex offense."

From an actuarial standpoint, Price testified that within a nationwide sample, between seven and nine percent of sex offenders with a score of 3 reoffend within five years; the number drops to 4 percent in a Texas-only sample. Those numbers, however, account only for offenders who are caught. But whether 4 percent or 7 to 9 percent, Price said he did not assign that percentage to Rollins because he considered other samples and other factors. As Price explained, a person can score low on the Static-99R and still have a behavioral abnormality, or he can score "super high" and not have one, which is why Price said he looks at other factors, interviews the offender in person, and considers things from their past, present, and future.

Price also administered the Risk for Sexual Violence Protocol, which he described as a "structured professional judgment risk assessment." The RSVP is a list of twenty-two factors that can increase the risk for reoffending but are not on the Static-99R. Price said it has no score and instead acts as a "kind of a checklist" to ensure he is looking at all possible factors, such as sexual deviance, substance abuse, and problems with planning and being supervised. Once those factors

are considered, Price said he can adjust the baseline up or down to arrive at an estimate of risk. Price said he did not necessarily learn anything new from administering this assessment; rather, he ensured he considered all the factors.

In making his assessment, Price also considered Rollings' institutional adjustment, which refers to how a person behaves in the prison system. According to Price, Rollings had made a "pretty good adjustment to incarceration." Rollings had been in prison for almost fifteen years and, in that time, had fourteen disciplinary cases. Of those, four were major incidents, such as fighting; one involved sexual misconduct for masturbating in the presence of a correctional officer.

At the time of the interview, Rollins had just begun a nine-month sex offender treatment program in prison. Price said successful completion of such a program reduces the risk of reoffending, but Rollings told Price he did not need the program because he was not a sex offender. Rollings said he enrolled to satisfy a requirement for parole. But, Price said, there were recent indications that in the program notes that Rollings "might have begun" to take responsibility for at least the offense involving S.B.

Rollings testified about his childhood, his substance abuse, and his extensive criminal history, including the sex offenses against children. He said he acknowledged that he had been in prison "off and on" for most of his adult life. He denied committing any offense, sexual or nonsexual, except the 1989 burglary of a motor vehicle, although he pleaded guilty or nolo contendere to all of them. His explanation was that he was "in the wrong place at the wrong time." Rollings testified he is in sex offender therapy only to satisfy requirements to meet parole eligibility. At trial, he had been in the nine-month program for eight months but could not explain what an "offense cycle" is or identify his triggers. He could only say that he has learned that he has "trust" issues in people. He said he does not need sex offender therapy because he was not guilty of the two sex offenses and only "took a plea deal[s]" to avoid a lengthy prison sentence.

To the extent he admitted the offenses while in group therapy, he said he did so only because the program required him to do so. He denied being sexually attracted to children and said he was not a sexually violent predator.

Dr. John Tennison, who practices forensic psychiatry, testified on Rollings's behalf. He told jurors that, in his opinion, Rollings did not have a behavior abnormality. Like Price, Tennison said he reviewed Rollings's records and scored him using the Static-99R. Rollings's score on the Static-99R was a "2 or 3," meaning someone with that score in the Texas sample has a "range of recidivism" within five years of between 2 and 5 percent. Tennison believed that score to be the best indicator of Rollings' risk to offend and said he saw no "good reason to adjust the clinical risk up or down relative to what the general Texas norms tell us." He acknowledged Rollings "could be said to have risk factors," but he believed the "magnitude" of those risk factors was small and did not believe Rollings was at risk for reoffending. He also believed there was not enough evidence to diagnose Rollings as a pedophile because two sexual acts with children "is not necessarily . . . an example of pedophilia." Rather, he said, the evidence would be "stronger, more suggestive of pedophilia" if there were "numerous instances of sex with boys."

After hearing the evidence, the jury found beyond a reasonable doubt that Rollings is a sexually violent predator. In accordance with the jury's verdict, the trial court ordered Rollings committed to a residential facility for treatment and supervision. This appeal followed.

We begin with Rollings's second issue challenging the legal sufficiency of the evidence to prove he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Wirtz*, 451 S.W.3d 462, 464 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (explaining legal sufficiency challenge must be addressed first because if evidence is insufficient, reviewing court must render judgment of acquittal).

Because the civil commitment statute requires the State to prove beyond a reasonable doubt that a person is a sexually violent predator, we review the legal sufficiency of the evidence using the appellate standard of review for criminal cases. *In re Commitment of Sawyer*, No. 05-17-00516-CV, 2018 WL 3372924, at *7 (Tex. App.—Dallas July 11, 2018, pet. denied). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the element required for commitment beyond a reasonable doubt. *Id.* The factfinder is responsible for fairly resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic to ultimate facts. *Id.*

In challenging the legal sufficiency of the evidence on appeal, Rollings takes issue with Price's opinion and argues that, at most, the State proved he was an "average" or typical sex offender who should be dealt with by the criminal justice system, not the chapter 841 civil commitment procedures. He first argues Price used an improper definition of "likely" to arrive at his opinion on behavioral abnormality, rendering his opinion legally insufficient.

Price defined likely as "more than a mere possibility," but Rollings suggests it must mean at least "more likely than not." Even if we assume Rollings is correct, reversal is not warranted here because a review of all the evidence establishes that Price's opinion was supported by at least a standard of "more likely than not." An expert's explanation of the term "likely," does not, in and of itself, render the evidence insufficient to support a jury's finding that a person suffers from a behavioral abnormality. *In re Commitment of Terry*, No. 09-15-00500-CV, 2016 WL 7323299, at *13 (Tex. App.—Beaumont Dec. 15, 2016, no. pet.) (mem. op.).

Next, Rollings argues his Static-99R score does not support a finding that he was "likely" to reoffend, regardless of how the term is defined. Rollings focuses on the fact that he scored in the "average" range for reoffending on the Static-99R and asserts there is insufficient evidence to support an upward adjustment of his risk by Price. We cannot agree.

–9–

Price utilized the same methodology as other experts who do these types of evaluations. Part of that methodology was the use of the Static-99R. But Price's testimony concerning Rollings's risk for reoffending did not end with the score on the Static-99R, and he ultimately determined the Static-99R alone underestimated Rollings's risk. Price testified that the question of whether a person has a behavioral abnormality could not be determined based solely on the Static-99R. As he explained, someone could score "super high" and not have a behavioral abnormality or could score "really low" and suffer a behavioral abnormality. That is the reason, he said, that he and others look at other factors and do a face-to-face interview.

Here, in making his evaluation, Price testified extensively about the information he considered in the various records related to Rollings and his interview with him. That information included the offense reports, victim statements, and prison records. Not only did Price determine Rollings was a pedophile, was sexually deviant, and had a "trace of features" of anti-social personality disorder, he also diagnosed Rollings with a substance abuse problem, which he said is a risk factor. Other risk factors included Rollings's extensive criminal history that began in his teens, and he committed new offenses while on probation or parole. Price also discussed at length Rollings's two sex-related offenses against children and how aspects of those crimes showed a risk for reoffending. He had relationships with both children: he believed the seven-year-old girl he assaulted was his biological daughter and the young boy he assaulted was the son of the woman to whom he was engaged. Price characterized the offenses as violent and coercive, with Rollings threatening the boy if he told and continuing to assault him even though he cried. Because Rollings had abused both a male and a female, of different ages, his victim pool was larger. And although he pleaded guilty to both offenses, he denied either ever occurred and, in one instance, blamed the mother of the child.

Finally, Price said successful completion of a sex offender treatment program can reduce a person's risk for reoffending. Nevertheless, the record showed Rollings had not completed the nine-month program or made much progress although he had been in the program eight months. According to Price, program notes suggested Rollings had recently begun to admit at least one of the offenses, but he was unable at trial to state his triggers or offense cycle. At trial, Rollings denied committing the offenses and said he did not need sex offender therapy.

In short, Price testified to several risk factors that he believed increased Rollings's risk of sexually offending, and the jury was entitled to give credit to that testimony. Considering all the evidence in the light most favorable to the verdict, we conclude the jury could find beyond a reasonable doubt that Rollings is a sexually violent predator and, as such, is likely to engage in a predatory act of sexual violence. *See In re Commitment of Anderson*, 2018 WL 3968499, at *5 (Tex. App.—Aug. 20, 2018, no pet.) (rejecting argument that evidence was insufficient to support commitment because appellant score two on Static-99R and was not psychopath; ample evidence showed appellant had condition predisposing him to commit another sexually violent offense to extent he was menace to health and safety of another person). We overrule the second issue.

In his first issue, Rollings complains the trial court erred by prohibiting him from asking potential jurors on voir dire if they could be fair to a pedophile.

During voir dire, the following occurred:

[DEFENSE COUNSEL]: Let's say you've got a person who in the bus or in the van he's been going around and he's been yanking people off the streets and he's been doing it for three months. He's yanked four different women off the street and he raped them, and convicted of two or three or four.

Sir, what's your name?

[VENIREPERSON]: Abraham Thomas.

[DEFENSE COUNSEL]: Could you be fair to that guy?

VENIREPERSON THOMAS: No.

–11–

[DEFENSE COUNSEL]:  No? Why?

[PROSECUTOR]:  Judge, I'm going to object to an improper commitment question, giving an exact example.

[TRIAL COURT]:  Sustained.

[DEFENSE COUNSEL]:  Okay.  What's your name, sir?

[VENIREPERSON]:  David Wood.

[DEFENSE COUNSEL]:  Mr. Wood, let's say the guy is a pedophile.  Could you be fair to that guy?

[VENIREPERSON WOOD]:  Yes.

[DEFENSE COUNSEL]:  You could?  How many people agree with Mr. Wood?  Come on, there's got to be somebody.  One, two, three, okay.

We'll go row by row.  How many of you could be fair?

[PROSECUTOR]:  Judge, I'm going to object.  Improper commitment question.

[TRIAL COURT]:  Let me see Counsel up here right quick.

(Off-the-record conference at the Bench among the Court and Counsel.)

[DEFENSE COUNSEL]:  All right.  I heard conversation going on out here.  Okay.  So let's change it up a bit.  Let's just change it up a little bit.

I'm going to rephrase the question.  Any question that I ask you has to do with whether or not you'd be fair and impartial and listen to the evidence.  Listen to the evidence and follow the law as the Judge gives it to you.  Understand that?

Can you do that?  Can you listen to all of the evidence and then follow the law the Judge gives to you?

What I want to know is, are you going to listen to that evidence?  Somewhere along the line a lot of people say, I'm done, that's all I need, I'm there.  I am there, I'm done, I don't need anymore.

So I have a situation where a guy who has been driving around in that van and has been stealing four and five year old kids off the street, kidnapping them.  He's got multiple convictions.  Here's the question:  Can you, yes, you, listen to all of the evidence?

VENIREPERSON FAULKNER:  Yes.

[DEFENSE COUNSEL]:  Follow the law as I give it to you?

VENIREPERSON FAULKNER:  Yes.

–12–

Defense counsel briefly continued with this line of questioning with a few more jurors before attempting to ask the following:

> [DEFENSE COUNSEL]: . . . The question is based on can you be fair and impartial, listen to all of the evidence and follow the law as the Judge gives you in a scenario where you have an individual going up and down a road in a van - -
>
> [PROSECUTOR]: Well, Judge, I'm just going to object to that. That is an improper commitment to a set of facts.
>
> [TRIAL COURT]: Sustained.

After a few comments, defense counsel returned to the trial court's ruling and said he objected to it "[w]ith respect to the particular set of circumstances." The trial court "noted" the objection. Voir dire ended the same day, and a jury was selected but not sworn.

The next morning, before the jury was sworn, defense counsel asked whether the bench conference from the day before was on the record, and the trial court told him the bench conferences were not. Defense counsel then asked to put the "information" in the record:

> [DEFENSE COUNSEL][1]: We definitely need to have the indication that we were asked to come up with a scenario in order to ask the last question, which inevitably - - I'm talking too fast - - inevitably wound up still being objected to and the objection was sustained, having to do with the - - I believe the final objection was it was still a commitment question to a specific set of facts.
>
> However, I think if we were to take a look at In Re Clinton Hill, which is a mercy case regarding a commitment question, we were still entitled to ask that question.
>
> So I need to make sure that that's in there, and I think that pretty much covers it.
>
> [TRIAL COURT]: Okay. Does the State wish to respond to the Respondent's objection?
>
> [PROSECUTOR]: Judge, the State's only response is if it's - - I'm not sure exactly which objection he's talking about, but if he's committing them to a specific set of facts, then I believe that is an objectionable voir dire issue.

---

[1] In the reporter's record, this portion of the exchange is attributed to the trial court, but a reading of the record establishes the remarks were made by defense counsel.

You can't commit them to a specific set of facts and ask them can they be fair or do something on a specific set of facts, and I think that's what was happening in this case, if that is the objection he's talking about.

[TRIAL COURT]: Is that what you're talking about, Mr. Brewer?

[DEFENSE COUNSEL]: In part, but herein lies kind of the - - a portion of it. We were asked to come up with a scenario. Any scenario we were going to come up with - -

[TRIAL COURT]: What I said was - - as I recall, what I said was that you couldn't use a specific set of facts and then commit the prospective jurors to that set of facts, that you would have to come up with a hypothetical type of situation and explain to them that this was a hypothetical set of facts. I can't tell you about the facts in this case but here's a hypothetical set of facts.

[DEFENSE COUNSEL]: Yes, sir, and that's exactly what we did.

[TRIAL COURT]: You know, could you be fair? If you heard this and this and this hypothetical situation, then could you still be open-minded and fair and whatever your question was.

But that wasn't the way it was posed t [sic] the jurors and so that's why I sustained the State's objection that it was a commitment question.

And that's when I called you up there and said, you know, if you want to find out, then you have to pose a hypothetical set of facts.

[DEFENSE COUNSEL]: Yes, Your Honor, and that's what we did. That's what we did.

Litigants have the right to question potential jurors to discover biases and to properly use peremptory challenges. *In re Commitment of Hill*, 334 S.W.3d 226, 229 (Tex. 2011). A trial court abuses its discretion "when its denial of the right to ask a proper question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges." *Id*. A party preserves error by a timely request that makes clear, by words or context, the grounds for the request and by obtaining a ruling on that request, whether express or implied. TEX. R. APP. P. 33.1; *In re Commitment of Hill*, 334 S.W.3d at 229.

Having read voir dire and the colloquy the following day regarding the unrecorded bench conference, the record does not establish that the trial court prohibited Rollings from asking

–14–

prospective jurors whether they could be fair to a pedophile. The trial court sustained an "improper commitment" objection to Rollings's specific fact pattern regarding a person driving around in a car or van. Rollings then added an additional fact to the scenario, pedophilia, which drew another objection of improper commitment question. The trial court did not rule on this objection but asked counsel to approach the bench. The conference was not recorded. Afterwards, Rollings continued with his questioning about the same scenario with a guy driving around in a van, changing the fact pattern to involve young children, and asked if the jury could listen to all the evidence. Later, he used the fact pattern again, drew another objection, and that objection was sustained.

The next day, defense counsel attempted to recreate what was said during the unrecorded bench conference, but at no time did he mention the term "pedophile" or complain that he was prevented from asking proper questions about that subject. Even in his motion for new trial, Rollings complained about the trial court limiting his voir dire but did not raise the complaint he has on appeal. Rather, he complained the trial court denied him the ability to ask a question as to whether prospective jurors "could be fair and impartial, listen to all the facts and follow the law as given to them by the court, to an individual who had committed a significant crime." He specifically referenced his attempt to ask this question using "an individual who kidnapped people off the street." Because we conclude the record does not support Rollings's complaint, we overrule the second issue. *See In re Commitment of Hill*, 334 S.W.3d at 229; *see also Veras v. State*, 410 S.W.3d 354, 357–58 (Tex. App.—Houston [14th] 2013, no pet.) (concluding appellant failed to preserve error based upon speculation or supposition as to what may have occurred during unrecorded bench conference).

We affirm the trial court's judgment.

/Molly Francis/
_____
MOLLY FRANCIS
JUSTICE

170938F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE COMMITMENT OF MARCUS
ELOISE ROLLINGS

No. 05-17-00938-CV

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. CV-16-70006.
Opinion delivered by Justice Francis;
Justices Stoddart and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered December 20, 2018.